UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ANNA BROGGI** | : | **CIVIL ACTION NO.:** |
| | : | |
| **Plaintiff,** | : | **3:22-cv-00434 (    )** |
| | : | |
| **v.** | : | |
| | : | |
| **AMERICAN MEDICAL RESPONSE** | : | |
| **OF CONNECTICUT, INC.** | : | |
| | : | |
| **Defendants.** | : | **March 24, 2022** |
| | : | |

## COMPLAINT

### I.     INTRODUCTION

1.      It wasn't long after Anna Broggi began working for American Medical Response of Connecticut, Inc. ("AMR") as an Emergency Medical Technician that she learned AMR operated as a boys' club, the leaders of which were the company's male supervisors.  There are 17 supervisors at AMR; only three of them are women.  All three of those women had sexual relationships with male supervisors before they were promoted.  Some of those male supervisors subjected Ms. Broggi and other women to sexualized comments and conduct.  Although Ms. Broggi and other women complained about AMR's boys' club, AMR took no action to rectify it.

2.      The message that men who objectify and sexually harass women may do so with impunity at AMR is deeply entrenched in its culture, not only by the way AMR's supervisors behave, but by how the company responds to complaints about such conduct.  For example, five women reported that an EMT sexually harassed and assaulted them.  The harasser was eventually given the option to resign, yet the company welcomed him back shortly after the women who complained left.

3.      It is not surprising then that when a co-worker sexually assaulted Ms. Broggi and she repeatedly pleaded with him to stop, he did not stop.  It is also not surprising that when she reported his unlawful and outright criminal conduct to her supervisor, he responded with the verbal equivalent of a shrug.  Indeed, AMR took no action to investigate her allegations or hold her predator co-worker accountable.  To the contrary, it was Ms. Broggi who was forced to change her shifts to avoid working with the person who attempted to rape her.

4.      It was not until six months later, at Ms. Broggi's insistence, that AMR finally conducted an "investigation."  Even though the predator co-worker outright admitted his unlawful conduct toward her in a text message the morning after he assaulted her, two weeks later, AMR concluded its investigation and welcomed him back to work.

5.      Accordingly, Anna Broggi brings claims for sexual harassment, sex discrimination, and hostile work environment based on sex, and retaliation for complaining about the same in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2; and the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. §§ 46a-60(b)(1), 46a-60(b)(4) and 46a-60(b)(8).

6.      Anna Broggi demands a jury trial on all claims so triable.

## II.    JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to the asserted claims occurred herein.

9.      This Court has supplemental jurisdiction over the plaintiff's state law claims, pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the federal law claims.

### III.    PARTIES

10.    Plaintiff Anna Broggi is a natural person who resides in Branford, Connecticut.

11.    Defendant American Medical Response of Connecticut, Inc. ("AMR") is a medical transportation company.  AMR is incorporated in the State of Connecticut.  It is located at 58 Middletown Avenue, New Haven, CT  06511.

12.    Defendant American Medical Response of Connecticut, Inc. employs 15 or more employees in Connecticut.

13.    At all relevant times mentioned herein, Defendant American Medical Response of Connecticut, Inc. was Anna Broggi's employer within the meaning of Title VII and the CFEPA.

### IV.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.    The plaintiff filed complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on or about September 17, 2021, alleging sex discrimination.  The complaints were dual filed with the federal Equal Employment Opportunity Commission ("EEOC").

15.    The CHRO complaints were filed in a timely manner insofar as they were filed within 180 days of the defendant's last discriminatory acts against plaintiff.

16.    The plaintiff received a Release of Jurisdiction from the CHRO, dated February 23, 2022, and a Notice of Right to Sue from the EEOC, dated March 14, 2022, for Defendant AMR.

17.    The plaintiff filed this Complaint within 90 days of her receipt of the agencies' releases of jurisdiction.

## V.    STATEMENT OF FACTS

### A.    AMR Fosters a Flagrantly Sexist Culture.

18.    Anna Broggi began working for AMR as an Emergency Medical Technician ("EMT") in January 2019.

19.    It soon became clear to her that AMR operated as a boys' club, the leaders of which were AMR's male supervisors.

20.    Within the first couple of months of her career there, one of her supervisors, Joe DeAngelis, grabbed her wrist and told her that he would do anything for her.

21.    On another occasion, Mr. DeAngelis put his hand on Ms. Broggi's thigh while asking her if she wanted a bottle of water.

22.    On yet another occasion, when employees were allowed to wear mental health awareness t-shirts, Mr. DeAngelis asked Ms. Broggi to tuck her shirt in.  When she stated that she preferred not to, he insisted, and she complied.  Thereafter, his eyes lingered over her chest area, and he said: "I don't know why you didn't want to tuck your shirt in.  Look how good you look now."

23.    Mr. DeAngelis was not the only supervisor to objectify Ms. Broggi.   Another supervisor, Mark Testa, directed her to keep smiling because it made his day.

24.    Only three of AMR's supervisors out of 17 total in the New Haven Division are women.

25.    All three of them had a sexual relationship with a male supervisor at the time they were promoted.  The message was – and remains – loud and clear to women who want to advance their careers at AMR: You can't succeed unless you concede.

26.    In the fall of 2020, AMR circulated a survey to ask employees about the workplace culture.  While many women, including Ms. Broggi, expressed concern in the survey that only

those women who were involved in sexual relationships with male supervisors were promoted, AMR had evinced little interest in taking affirmative steps to change its culture. Other supervisory positions have opened since the survey was conducted and it has not promoted any other women into those roles.

27.     AMR's dismissive attitude toward its sexist culture is not limited to the way it hobbles career advancement for female employees who are not in sexual relationships with male supervisors. Before Ms. Broggi joined AMR, several women raised complaints about an EMT, Benjamin Barry, who subjected them to sexual harassment and outright sexual assault.

28.     AMR gave Mr. Barry the option to resign, and he did.

29.     Upon information and belief, after the women who complained about Mr. Barry had left their employment with AMR, AMR reached out to Mr. Barry and invited him to re-join AMR.

30.     Shortly thereafter, AMR rehired Mr. Barry and he remains employed with AMR presently.

**B.      AMR Employee Anthony Salerno Sexually Assaults and Attempts to Rape Ms. Broggi.**

31.     Mr. Salerno and Ms. Broggi originally met when he was employed at St. Raphael's Hospital as an Emergency Room Technician, and she was working as an EMT at AMR. In August 2019, they dated briefly. Thereafter they parted amicably, and both moved on to other relationships.

32.     Three months later, Mr. Salerno became engaged to a woman who was also employed at the hospital where he worked. He separated from his employment there shortly thereafter.

33.     In late summer 2020, Mr. Salerno was hired by AMR.

34.     For the first several months of Mr. Salerno's employment, Mr. Salerno and Ms. Broggi maintained a friendship.  While their communications with each other were at times flirtatious, they both agreed that their relationship would remain platonic.

35.      On November 23, 2020, after working a shift together, Mr. Salerno, another co-worker named Patrick Maher, and Ms. Broggi gathered in the parking lot next to the AMR building to socialize and drink, as AMR employees did every Monday.

36.     Ms. Broggi had school and a nursing exam early the next morning, so she limited herself to one drink and sipped it slowly.

37.     The night was frigid, and as Mr. Maher was leaving, Mr. Salerno invited Ms. Broggi to sit in his heated car to finish their drinks.

38.     As soon as they entered the car, Mr. Salerno turned the headlights off, locked the doors, and told Ms. Broggi he did not want anyone to see them.  He tried to kiss Ms. Broggi, but she did not kiss him back.  She said "no," told him to stop, and reminded him they had agreed to be friends only.  Mr. Salerno ignored her.  Instead, he continued to kiss Ms. Broggi and, as she continued to say "no," he stuffed his hand into her mouth and down her throat, silencing her.

39.     Mr. Salerno's actions against Ms. Broggi that night made it clear he intended to rape her.  He held Ms. Broggi down with his shoulder pinned against hers while using his free hand to grab her breasts and attempt to undo her pants.  Ms. Broggi struggled to get free and repeatedly pleaded with him to stop, but he overpowered her and continued to molest her.

40.     Ms. Broggi frantically tried to open the car door, but Mr. Salerno grabbed her hand and pinned it down.  When she was finally able to wrestle her hand free, she unlocked the door and opened it to get out.  Mr. Salerno grabbed the door and shut it.

41.     Once again, Ms. Broggi attempted to escape and this time was able to open the door and get one foot out.  Mr. Salerno tried to close the door again, but Ms. Broggi's foot prevented the door from closing, and she was finally able to flee the car.

42.     Ms. Broggi was shaking as she entered her own car.  As she drove home, she called Patrick Maher, the coworker who had been in the parking lot that night, and told him what Mr. Salerno had done to her. To her shock, Mr. Maher condoned Mr. Salerno's assault, responding that Mr. Salerno must have assumed that his conduct was welcome because she got in his car and because they had dated a year ago.

**C.     Mr. Salerno Admits He Sexually Attacked Ms. Broggi.**

43.     The next day, Ms. Broggi she saw she had received a text from Mr. Salerno stating that he "apologize[d] for the car last night."  Ms. Broggi responded in pertinent part as follows:

> I truly hope you realize how much you fucked up.  I said no and told you to stop multiple times and you didn't.  I had to force my way out of your car.  I know we have a history, but we've also had numerous conversations, as recently as 30 minutes before that happened, that we discussed us being strictly platonic but, regardless of any of that, don't force yourself on me.  I shouldn't even have to say this to get my point across but my dad loves me as much as you love [your daughter] and imagine how you'd feel 25 years from now if you found out someone did to [your daughter] what you did to me last night? Should you really be treating women that way?

44.     In response, Mr. Salerno <u>admitted</u> that he sexually assaulted Ms. Broggi:

> I understand that and that is 100% the reason why I feel so entirely like a piece of shit.  I feel like I ruined all trust you had in me and our friendship.  I don't know how you could ever want to be around me again and I can't understand what was going on in my mind to make me act that way.  I am truly so sorry.  I woke up this morning and had the worst regret ever and I don't know how to express it or how to tell you how shitty I feel . . .

45.     Ms. Broggi responded by informing Mr. Salerno that she did not want to work on any more shifts with him nor did she want any other interaction with him.

46.     Thereafter, whenever Ms. Broggi saw that she was scheduled for the same shift as Mr. Salerno, she turned down the shift.

**D.     Ms. Broggi Reports the Sexual Assault to the Police.  When She Informs Her Supervisor of the Attack, He Incorrectly States that, Because It Happened Off Premises, the Company Is Powerless to Act.**

47.     In the ensuing days after the attack, Ms. Broggi shared with two friends and coworkers that Mr. Salerno had sexually assaulted her.  Both urged her to report Mr. Salerno's criminal conduct to the police.

48.     On December 15, 2020, Ms. Broggi filed a police report with the New Haven Police Department and described Mr. Salerno's sexual assault of her.   While she stated to the officers who interviewed her that she did not want to press charges at that time, she made it clear she wanted to have a record of the assault to protect her safety going forward.

49.     Later that same day, Ms. Broggi went to work.

50.     Soon after she entered the workplace, she could not stop crying.  Her supervisor, Chris Pizzorusso, saw how distraught she was and asked her what was wrong.  Ms. Broggi informed him that Mr. Salerno had sexually assaulted her and that she had just reported that assault to the police.

51.     Mr. Pizzorusso asked where the assault had taken place, and Ms. Broggi pointed to the parking lot.  Mr. Pizzorusso responded: "Oh, sorry, that parking lot is not technically owned by AMR."

52.     While Mr. Pizzorusso agreed to Ms. Broggi's request that she and Mr. Salerno not work together, what was notable is what he did not do.   He did not say he would speak to Mr. Salerno, let alone investigate her allegations against him.  He did not refer Ms. Broggi to Human Resources to file a formal complaint.  He did not offer her any resources to help her cope with her trauma.

53.     From that point forward, it was clear to Ms. Broggi that AMR would not protect her from Mr. Salerno.  Faced with no other choice, she began to implement her own methods to protect herself at work.  Ms. Broggi avoided shifts with Mr. Salerno when she could and, when she did work, she chose the same shifts as a few co-workers with whom she had shared information about the assault, and they would walk with her to her car at night.

**E.     Ms. Broggi Learns that Her Supervisor Misled Her and Seeks Out Her Union Representative and AMR Management to Report the Sexual Assault.**

54.     Seven months later, in or about July 2021, Ms. Broggi underwent AMR compliance training that included modules about sexual harassment and assault.  Through that training, she learned for the first time the truth about her employer's responsibility:  AMR is required to investigate and address a sexual assault committed by an employee against another employee, regardless of where the assault occurs.

55.     On August 10, 2021, Ms. Broggi reached out to her union representative, Mike Montanaro, and told him about Mr. Salerno's sexual assault of her.  She explained to him that, when she reported it to Mr. Pizzorusso, he told her nothing could be done about it because it did not happen on company property.  Mr. Montanaro confirmed that Mr. Pizzorusso's response violated company policy and suggested that Ms. Broggi bring her complaint to AMR's Chief Operations Manager Timothy Craven.  He also assured her that the union and he personally would help her.

56.     On August 11, 2021, Ms. Broggi informed Mr. Pizzorusso that she intended to report Mr. Salerno's sexual assault of her to Mr. Craven.

57.     That same day, she e-mailed Mr. Craven and informed him that she had an urgent concern she needed to discuss with him.

58.     Mr. Craven did not respond to her e-mail.

9

59.    On August 12, 2021, Ms. Broggi told Mr. Montanaro of her unsuccessful attempt to reach Mr. Craven.  Mr. Montanaro provided her with Mr. Craven's phone number and shared with her that, earlier that same morning, he had been in Mr. Craven's office when Mr. Pizzorusso walked in and "brought them both up to speed" about her allegations.

**F.    Mr. Craven Treats Ms. Broggi with Hostility and Contempt.  As She Sobs while Describing the Sexual Assault, He Admonishes Her: "This Is Not a Big Deal."**

60.    Later that same day, Ms. Broggi called Mr. Craven, and he agreed to meet with her that afternoon.

61.    She arrived a little early and was standing outside Mr. Craven's office with her friend and co-worker, Heather Walsh, when Mr. Craven walked by.  Ms. Broggi introduced herself, stated that she had a meeting with him, and asked if Mr. Montanaro could be present for the discussion.  Mr. Craven responded: "We can do this now or not do it.  I don't have time to make sure Mike [Montanaro] can be here."

62.    Despite Mr. Craven's intimidating manner, Ms. Broggi forced herself to walk into his office alone and retell the events that led to the meeting.  She explained the brief period in which Mr. Salerno and she had dated, their reconnection as friends when AMR hired him, and his sexual attack of her in November.

63.    Ms. Broggi was crying and shaking as she described Mr. Salerno's sexual violence toward her.  Mr. Craven responded to Ms. Broggi's distraught state by rebuking her: "Calm down, this is not a big deal, you should not be getting so worked up."  She responded that it was a big deal and that she had a right to be upset as she had to relive this moment every day since November.  Mr. Craven responded, "Yes, but don't get worked up.  You're just telling the story."  He repeated, "It's not that big of a deal."

64.     Thereafter, Mr. Craven abruptly rose, told Ms. Broggi that the description of the events she was sharing was "a lot different than the story I got this morning," and asked her to wait in his office.

G.     **Mr. Craven Victim-Shames Ms. Broggi, and Human Resources Representative Carapezza Does Nothing to Stop It.**

65.     When Mr. Craven returned to his office, he was accompanied by AMR human resources representative Alison Carapezza.

66.     Thereafter, they had Ms. Broggi repeat the details of the assault.  Even though she shared with them the text communications between herself and Mr. Salerno in which he admitted that he sexually assaulted her, Ms. Carapezza asked her whether there were any witnesses, what she did after the assault, and how she knew Mr. Salerno.

67.     At one point, Mr. Craven's tone was so hostile that Ms. Broggi asked him why he was acting like she was in trouble.  Mr. Craven stated that Mr. Salerno likely assumed it was okay for him to do what he did to her because they had dated in the past.  He also stated that sometimes when alcohol is involved the lines get blurred.

68.     Ms. Carapezza did not challenge or even address Mr. Craven's suggestion that Ms. Broggi was to blame.

69.     Toward the end of the meeting, Ms. Broggi told Mr. Craven and Ms. Carapezza that she felt unsafe being at work with Mr. Salerno, particularly now that she had shared with them what he had done to her.  While they told her that if Mr. Salerno retaliated against her it would violate AMR's policy, what was notable about the meeting once again was what they did not say: they did not say they would take any measures to keep Ms. Broggi safe; they did not offer her any resources to help her cope with the trauma.

11

70.     Ms. Broggi was then directed to wait outside of Mr. Craven's office.  Shortly thereafter, as she stood outside of his office, crying, Mr. Salerno walked right past her and entered Mr. Craven's office.  Ms. Broggi was horrified and broke down further.

**H.     AMR Places Mr. Salerno on a Brief Administrative Leave and, After a Quick Internal Investigation, Welcomes Him Back to Work.**

71.     On August 13, 2021, Ms. Carapezza informed Ms. Broggi that Mr. Salerno was placed on administrative leave.

72.     On August 16, 2021, Ms. Broggi informed the police that she did indeed want to press charges against Mr. Salerno.

73.     On August 29, 2021, Ms. Carapezza informed her that the investigation had concluded, and that Mr. Salerno would be returning to work.  When Ms. Broggi pressed for details to understand why this was happening, Ms. Carapezza refused to give her any, instead referring her to human resources generalist Krista Pickering.

74.     Ms. Pickering informed Ms. Broggi that AMR had been waiting for the police to press charges, but, since they had not yet done so, AMR decided to welcome Mr. Salerno back to work.  She advised Ms. Broggi that, should the police press charges in the future, AMR could re-open the investigation.

75.     Soon thereafter, one of Ms. Broggi's co-workers observed Mr. Craven and Mr. Salerno chatting amicably.

**I.      After Ms. Broggi Files a CHRO Complaint Against AMR, the Company Finally Hires an External Investigator to Conduct a Second Investigation; Tim Craven Is Removed from His Position as Operations Manager.**

76.     On or around September 17, 2021, Ms. Broggi filed a complaint with the CHRO alleging sex discrimination, hostile work environment based on sex and retaliation for complaining about the same, as described in paragraphs 18-75.

12

77.     Following the filing of this complaint, AMR hired an external investigator to conduct a second investigation into complaints about the culture within AMR.

78.     As part of this investigation, Ms. Broggi was interviewed twice, most recently on January 10, 2022, at approximately 10:30am.

79.     Later that same day, Regional Director Bill Schietinger sent an internal memo to AMR New Haven County & Communications Employees.

80.     The memo announced that Mr. Craven would not continue in his role as Operations Manager but would instead move into an Administrative Supervisor position.  Another internal male employee, Mike Turcio, would assume Mr. Craven's role as Operations Manager.

81.     This memo stated that AMR made these changes to help "change our culture for the better and meet these challenges head on."

**J.     Following an Internal Announcement of the Company's Desire to "Change Culture for the Better," AMR Hires a New Male Paramedic with a Widely-Known History of Sexual Harassment and Violence Against Women.**

82.     Shortly after AMR circulated Mr. Schietinger's memo, it hired Hershel Wadley, former Deputy Chief of the New Haven Fire Department**.**

83.     A background check and verification of Mr. Wadley's state license reveals that he has a history of sexual harassment and sexual violence in the workplace.

84.     In the Summer of 2006, a female employee of the Hospital of Saint Raphael alleged that Wadley showed her a photograph of his genitalia.

85.      The State of Connecticut Department of Public Health investigated this allegation and thereafter Wadley was placed on probation with the State Licensing Board for a year and was required to undergo therapy at his own expense.

86.     Wadley's paramedic license reflects that a consent order was entered related to this conduct.

87.     In December 2018, Mr. Wadley was arrested and charged with third-degree assault and disorderly conduct for allegedly attacking a female employee at a uniform store after she would not acquiesce to his demand that she falsify records so he could buy a pair of boots that were not on the approved uniform list.

88.     During the attack, he allegedly pushed the clerk's head, positioned himself behind her, grabbed her by the back of the neck, and squeezed and shook her.

89.     Thereafter, Mr. Wadley received a 15-day suspension from his position as Battalion Chief with the New Haven Fire Department.

90.     Mr. Wadley's alleged attack of this female employee was widely covered in the media.

91.     On July 30, 2019, as a result of this attack, the New Haven Fire Department placed Wadley on a three-year last chance agreement.

92.      On June 15, 2021, in an article entitled "Fire Deputy Promoted, Right Before Court", the New Haven Independent reported the following:

> Herschel Wadley's name was on two agendas Tuesday: for a 9:30 a.m. promotion ceremony at fire headquarters, followed by a 10 a.m. court hearing in an assault case.
>
> He became deputy chief at the first.  He was the defendant in the second.
>
> At the first meeting . . . the Board of Fire Commissioners unanimously approved promoting Wadley from his former role as battalion chief to the higher rank of deputy chief.

93.     In August 2021, just a few months into Mr. Wadley's role as Deputy Chief, a female civilian alleged that he approached her from behind and jabbed his fingers into her side several times.

94.    Later that same month, this same female civilian alleged that Mr. Wadley grabbed her around her waist, pulled her toward him, and told her: "I've been waiting to get this close to you."

95.    A third-party investigator investigated the female civilian's allegations.    The investigator interviewed the female civilian, Mr. Wadley, and several other witnesses.

96.    The final investigation report stated that it was "extremely important to note that there is a stark uneven power dynamic in the workplace between . . . [the female civilian] and Wadley, as a Deputy Chief in the fire department."

97.    The final investigatory report referenced Mr. Wadley's repeated acts of sexual violence toward women and stated in pertinent part:

> It is [ ] evident that Wadley's history demonstrates he has extremely poor judgment with physical and sexual boundaries with females.

98.    The investigatory report also found that Mr. Wadley violated the Department's sexual harassment policy and his last chance agreement and committed numerous other violations of New Haven Fire Department Rules and Regulations, including "untruthfulness or willful misrepresentation in matters affecting the Department or employees."

99.    Upon information and belief, the New Haven Fire Department gave Mr. Wadley the choice of resigning or being terminated.

100.    AMR's choice to then hire Mr. Wadley as a paramedic reinforced for all AMR employees the hollowness of its claims that it wishes to change its culture for the better.

101.    AMR's long-standing and continuing culture of tolerating and even supporting men who sexually harass and assault women created an environment in which Mr. Salerno felt emboldened to assault Ms. Broggi without fear of repercussion or accountability.

102.    The sexual violence Mr. Salerno inflicted on Ms. Broggi and AMR's callous and dismissive response to it has caused Ms. Broggi deep emotional harm, which she continues to suffer to this day.

## VI.   LEGAL CLAIMS

### COUNT ONE:
### SEX DISCRIMINATION,
### IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e *et seq*.

103.   The plaintiff incorporates by reference all preceding allegations in this Complaint.

104.   Defendant AMR discriminated against Anna Broggi because of her sex.

105.   AMR's unlawful conduct was committed willfully or with reckless disregard for Anna Broggi's right to be free from sex discrimination.

106.   As a result of AMR's conduct, Anna Broggi suffered damages.

### COUNT TWO:
### SEX DISCRIMINATION,
### IN VIOLATION OF THE CFEPA,
### CONN. GEN. STAT. § 46a-60(b)(1)

107.   The plaintiff incorporates by reference all preceding allegations in this Complaint.

108.   Anna Broggi's sex was a motivating factor in AMR's decision to take one or more adverse employment actions against her.

109.   AMR's unlawful conduct was committed willfully or with reckless disregard for Anna Broggi's right to be free from sex discrimination.

110.   As a result of AMR's conduct, Anna Broggi suffered damages.

### COUNT THREE:
### HOSTILE WORK ENVIRONMENT ON THE BASIS OF SEX,
### IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-2(a)(1)

111.   Anna Broggi incorporates by reference all preceding allegations in this Complaint.

112.   Anna Broggi's workplace at AMR was permeated with discrimination on the basis of sex that was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a hostile working environment.

113.   AMR's conduct in this regard was willful and/or in reckless disregard to Anna Broggi's right to be free from discrimination.

114.   As a result of AMR's conduct, Anna Broggi suffered damages.

## COUNT FOUR:
## HOSTILE WORK ENVIRONMENT ON THE BASIS OF SEX,
## IN VIOLATION OF THE CFEPA, CONN. GEN. STAT. § 46a-60(b)(1)

115.   Anna Broggi plaintiff incorporates by reference all preceding allegations in this Complaint.

116.   Anna Broggi's workplace at AMR was permeated with discrimination on the basis of sex that was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a hostile working environment.

117.   AMR's conduct in this regard was willful and/or in reckless disregard to Anna Broggi's right to be free from discrimination.

118.   As a result of AMR conduct, Anna Broggi suffered damages.

## COUNT FIVE:
## HOSTILE WORK ENVIRONMENT / SEXUAL HARASSMENT,
## IN VIOLATION OF THE CFEPA, CONN. GEN. STAT. § 46a-60(b)(8)

119.   Anna Broggi incorporates by reference all preceding allegations in this Complaint.

120.   Anna Broggi was subjected to sexual harassment insofar as unwelcome sexual advances had the purpose or effect of substantially interfering with her work performance and/or created an intimidating, hostile, or offensive working environment.

121.   AMR's conduct in this regard was willful and/or in reckless disregard to Anna Broggi's right to be free from discrimination.

122.   As a result of AMR's conduct, Anna Broggi suffered damages.

**COUNT SIX:**
**RETALIATION,**
**IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-3(a)**

123.    Anna Broggi incorporates by reference all preceding allegations in this Complaint.

124.    Anna Broggi opposed an unlawful employment practice under Title VII —
namely, the creation of a hostile work environment on the basis of sex.

125.    Anna Broggi's opposition to discrimination was a motivating factor in AMR's
decision to subject and/or continue to the subject the plaintiff to a hostile work environment.

126.    AMR'S conduct in this regard was willful and/or in reckless disregard to Anna
Broggi's right to be free from discrimination.

127.    As a result of AMR's conduct, Anna Broggi suffered damages.

**COUNT SEVEN:**
**RETALIATION,**
**IN VIOLATION OF THE CFEPA, CONN. GEN. STAT. § 46a-60(b)(4)**

128.    Anna Broggi incorporates by reference all preceding allegations in this Complaint.

129.    Anna Broggi opposed an unlawful employment practice under the CFEPA —
namely, the creation of a hostile work environment on the basis of sex.

130.    Anna Broggi's opposition to discrimination was a motivating factor in AMR's
decision to subject and/or continue to the subject the plaintiff to a hostile work environment.

131.    AMR'S conduct in this regard was willful and/or in reckless disregard to Anna
Broggi's right to be free from discrimination.

132.    As a result of AMR's conduct, the plaintiff suffered damages.

* * *

**WHEREFORE,** Plaintiff, Anna Broggi requests that this Court assume jurisdiction over

this Complaint, enter judgment in her favor, and award her:

1.  Economic damages;

2.  Compensatory damages;

3.  Punitive damages;

4.  Interest, pursuant to § 37-3a of the Connecticut General Statutes;

5.  Reasonable attorney's fees and costs; and

6.  Such other relief as may be just and equitable.

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFF**

By:    */s/ Nina T. Pirrotti*
   Nina T. Pirrotti *(ct26792)*
   Joshua R. Goodbaum *(ct28834)*
   Jordan E. Sala *(ct30627)*
   GARRISON, LEVIN-EPSTEIN
    FITZGERALD & PIRROTTI, P.C.
   405 Orange Street
   New Haven, CT  06511
   Tel.: (203) 777-4425
   Fax: (203) 776-3965
   npirrotti@garrisonlaw.com
   jgoodbaum@garrisonlaw.com
   jsala@garrisonlaw.com

   HER COUNSEL